# EXHIBIT J

1   doubt.
2           In this courthouse some bad cases are tried.  You have
3   terrorism cases, you have Mafia cases.  And as a lawyer, you
4   wonder, when that word "terrorism" is thrown out there or "Al
5   Qaeda," can a person ever get a fair trial?  Well, when a
6   person is accused of a crime against a child, a minor, a young
7   woman under 18, you have to wonder the same thing.  I certainly
8   do.  That's why you guys were chosen, the twelve of you and
9   maybe the two alternates, to use your common sense, to make
10  sure Mr. Corley gets a fair trial.  Not to prejudge him, not to
11  decide after the attorneys' opening statements whether or not
12  he's guilty.  Give him a fair shot, that's all we ask for.  We
13  don't want your sympathy, we just want a fair trial, that's all
14  we're asking for.  And if you do that, Mr. Corley and I are
15  good, and everyone in this courthouse will be satisfied.
16          Thank you very much.
17          THE COURT:  All right.  First witness.
18          MS. MARTINS:  Your Honor, the government calls
19  Detective Mark Woods.
20   MARK WOODS,
21      called as a witness by the Government,
22      having been duly sworn, testified as follows:
23  DIRECT EXAMINATION
24  BY MS. MARTINS:
25  Q.  Detective Woods, where do you work?

1  A.  I work with the New York City Police Department.
2  Q.  How long have you been with NYPD?
3  A.  Just about 14 years.
4  Q.  And I believe I just called you detective, but is that your
5  rank?
6  A.  Yes.
7  Q.  How long have you been a detective with the NYPD?
8  A.  I've been a detective for five years.
9  Q.  Where are you currently assigned?
10 A.  I'm currently assigned to the joint terrorism task force.
11 Q.  How long have you been with the joint terrorism task force
12 about?
13 A.  Five months.
14 Q.  What did you do or where were you assigned before joining
15 the joint terrorism task force?
16 A.  I was with the vice human trafficking team.
17 Q.  How long were you with the NYPD's vice human trafficking
18 team?
19 A.  I was with them for two years.
20 Q.  And that's two years with the human trafficking team.  Were
21 you in vice for a longer period than that?
22 A.  Yes, I was in vice for just about seven years.
23 Q.  Now in general terms, can you describe for the jury what
24 some of your duties and responsibilities were as part of the
25 vice?

1  A.  Primarily I was to investigate allegations of prostitution,
2  gambling, or alcohol violations, specifically underage
3  prostitution.
4  Q.  Now in the course of performing your duties at vice, did
5  you participate in an investigation into prostitution of minors
6  involving Royce Corley?
7  A.  Yes, I did.
8  Q.  When did that investigation began?
9  A.  That investigation began in December of 2011.
10 Q.  And at the time of the investigation, did you know
11 Mr. Corley by any other names?
12 A.  Yes, I did.
13 Q.  What was that?
14 A.  Ron Iron.
15 Q.  What was your role in the investigation of Royce Corley,
16 also known as Ron Iron?
17 A.  I was the lead detective.
18 Q.  What does it mean to be a lead detective of a case?
19 A.  I direct the day-to-day operations of the direction of the
20 investigation.  I primarily conduct the entire investigation.
21 Q.  You're basically the lead investigator on a particular
22 case, is that right?
23 A.  Yes, that's correct.
24 Q.  Now did you ultimately participate in Royce Corley's arrest
25 in connection with your investigation?

1   A.   Yes, I did.

2   Q.   And when was that?

3   A.   That was in January 25th of 2012.

4   Q.   Now looking around the courtroom today, do you see

5   Mr. Corley?

6   A.   Yes, I do.

7   Q.   Can you please describe him by identifying where he's

8   sitting and pointing out a particular item of clothing?

9   A.   Sitting right there.  He has black sweater or jacket.

10           MS. MARTINS:  Your Honor, may the record reflect the

11   witness identified the defendant?

12           THE COURT:  Which table do you think he was at?

13           THE WITNESS:  The second table, your Honor.

14           THE COURT:  The record will so indicate.

15   Q.   Now let's talk about that investigation in more detail.

16   How did the investigation into the defendant begin?

17   A.   I was at the Manhattan DA's office on an unrelated case.  I

18   was asked to conduct an interview --

19           MR. DeMARCO:  Objection.  What he was asked, your

20   Honor.

21           THE COURT:  Objection sustained.

22           MS. MARTINS:  Sorry, your Honor, did you sustained the

23   objection as to my question or to his answer?

24           THE COURT:  His answer, the part getting into what

25   someone else told him.  The rest of the question can be

1  answered.
2  Q.  Let me ask the question again.  Just tell us, without
3  talking about what anybody told you, how did your investigation
4  begin?
5  A.  I conducted an interview of a victim of an unrelated crime.
6  During the course of that interview it became clear to me
7  that --
8           MR. DeMARCO:  Objection.
9           THE COURT:  Objection sustained as to what the witness
10 told him.
11          MS. MARTINS:  Your Honor, if I may, we're not offering
12 it for its truth, just to explain how the investigation began.
13          THE COURT:  I don't know if that's an adequate ground
14 for getting in what you are getting in, how the investigation
15 began.  It seems to me to be getting to the same thing, just
16 putting a different question which raises the same answer.
17 Q.  Detective Woods, in the latter part of 2011, did you
18 interview a person named Elaine Jones?
19 A.  Yes, I did.
20 Q.  And in the course of that interview, did Ms. Jones show you
21 an internet advertisement for sex that the featured her?
22 A.  Yes, she did.
23 Q.  Where was that internet advertisement posted?
24 A.  On Backpage.com.
25 Q.  In the course of your six years at vice, did you become

1  familiar with the web site Backpage.com?
2  A.  Yes, I did.
3  Q.  Can you briefly describe what that web site is.
4  A.  Backpage.com is a web site, basically an online classified
5  like you see in the newspapers advertising things for sale,
6  things to trade, jobs, that sort of stuff.
7  Q.  Is there any particular section of that web site that had
8  become relevant to you in your investigations?
9  A.  Yes.
10 Q.  What is that?
11 A.  There's a section for escorts.
12 Q.  And what have you learned in the course of your duties with
13 vice about that section on escorts?
14 A.  It's a section that advertises for prostitution.
15 Q.  What percentage of your investigations was Backpage.com
16 used in connection with prostitution and sex trafficking
17 activities?
18 A.  I would say the majority of my cases.
19          MS. MARTINS:  Your Honor, I would like to now read a
20 stipulation.
21          THE COURT:  Yes.
22          MS. MARTINS:  Your Honor, it's hereby stipulated --
23          THE COURT:  Let's have a number for the stipulation.
24          MS. MARTINS:  The stipulation is Government
25 Exhibit 130.

1              THE COURT:  All right.

2              MS. MARTINS:  It's stipulated and agreed by the

3    parties, that is, the United States and the defendant, that

4    Government Exhibit 40 and all of its subparts basically are

5    true and accurate business records of Backpage.com, and that

6    Government Exhibit 40 and its subparts was recorded at or near

7    the time the activity reflected on those exhibits took place,

8    and that they were kept in the regular course of business

9    activity of Backpage.com.

10             And it's further stipulated and agreed by the parties

11   that if called to testify, a Backpage.com witness would testify

12   that the computer server for Backpage.com is located in Arizona

13   and that payments for the ads posted on Backpage.com are

14   processed in Massachusetts.

15             And it's further stipulated and agreed that Government

16   Exhibit 40 and all of its subparts are admissible into

17   evidence, as well as this stipulation, Government Exhibit 130.

18             (Continued on next page)

Case 1:15-cr-00624-KPF Document 103 Filed 10/26/18 Page 27 of 95

27

Dbcecor2                                    Woods - direct

1      THE COURT: All right. Government Exhibit 130 and I
2 guess Government Exhibit 40, is that correct?
3      MS. MARTINS: That's right, your Honor, Government
4 Exhibit 40 and its subparts.
5      THE COURT: And its subparts, are admitted in
6 evidence.
7      (Government's Exhibits 130, 40 and its subparts
8 received in evidence)
9      THE COURT: All subparts is that or --
10     MS. MARTINS: Yes, your Honor.
11     Your Honor, with your permission, I'd like to leave a
12 few of the exhibits that I'm going to discuss in front of the
13 witness.
14     THE COURT: Yes.
15 BY MS. MARTINS:
16 Q. Detective Woods, can you please look in front of you at
17 what's now in evidence as Government Exhibit 40A1. Do you see
18 that? Should be the first one on the pile.
19 A. Yes, I do.
20 Q. Do you recognize that?
21 A. Yes, I do.
22 Q. What is that?
23 A. This is a depiction of the ad that I was shown from
24 backpage.com.
25 Q. When you say you were shown, shown by who?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  A.  By Elaine Jones.
2  Q.  Ms. Chace, can you publish that exhibit, please.  Can you
3  zoom in on the top half, just the actual ad, Ms. Chace.
4           THE COURT:  You can't see it very well.  I don't know
5  if the jury can see it.
6  Q.  So, Detective Woods, is that the ad that you were shown
7  that initial day that we just discussed?
8  A.  Yes, it was.
9  Q.  And do you recognize the person depicted in that photograph
10  on the upper right?
11  A.  Yes, I do.
12  Q.  Who is that?
13  A.  That's Elaine Jones.
14  Q.  That's the person you met with that day, correct?
15  A.  Correct.
16  Q.  And do you see it says ebony Russian pearl necklace queen,
17  $120 special?
18  A.  Yes.
19  Q.  Do you see that?
20  A.  Yes.
21  Q.  And, Ms. Chace, I'm just going to read the description on
22  the ad.  It says small, sexy and very busty caramel complexion
23  southern black girl.  Very open and uninhibited, looking for
24  the pearliest of necklaces to go with my all natural Russian
25  melons.  Hosting at my place and offering special for your

1   Saturday enjoyment.  And then underneath $160 an hour, and then
2   it says Minna.  Do you see that?  There's a telephone number
3   listed.
4   A.  Yes, I do.
5   Q.  So after you were shown this ad on backpage.com, what did
6   you do next?
7   A.  I had subpoenas issued to backpage.com to find out how the
8   ad was paid for, any associated ads and the IP address where it
9   was posted from.
10  Q.  And why did you subpoena backpage.com for that information?
11  A.  Finding out what bank account or credit card information
12  paid for the ad would tell me who at least was involved with
13  posting it.
14  Q.  Did you receive subpoena returns or those records that you
15  subpoenaed from backpage.com?
16  A.  Yes, I did.
17  Q.  What categories of information did backpage.com provide
18  back to you?
19  A.  They provide payment information, bank accounts or credit
20  cards, IP addresses, locations where the ads were posted from,
21  also any associated ads paid for with the same bank account or
22  credit card information.
23  Q.  Now, in the course of your investigation as part of vice,
24  did you become familiar with what an IP address is?
25  A.  Yes.

1   Q.  Can you just briefly explain to us what that is, what an IP
2   address is?
3   A.  Aesthetic IP address is generally a unique signature
4   applied to a specific computer or a specific location.  It's a
5   series of numbers and periods.
6   Q.  When you say "a specific location," are you talking about a
7   specific physical location?
8   A.  It could be, yes.
9   Q.  And how does the IP address give you relevant information
10  to an investigation, such as this one, for example?
11  A.  You can subpoena the IP address through whatever carrier is
12  providing Internet service, and they'll tell you the address
13  from where the ad was posted from.
14  Q.  And when you say address, again, you mean a physical
15  address?
16  A.  Physical address, yes.
17  Q.  Now, you said you also received ads that were associated
18  with that initial ad that we just looked at, right?
19  A.  Yes.
20  Q.  Can you just explain to us what you mean by an ad that's
21  associated with another ad.  How are the ads associated?
22  A.  The ads would be associated because they were paid for by
23  using the same bank account or credit card.
24  Q.  So after you received the posting and payment information
25  that you just described as well as the associated ads, what did

1  you do next?
2  A.  At that point we took kind of a two-step approach.  The
3  first thing we did was we went through the ads to look to see
4  if anything was currently being posted.  We pulled out any and
5  all phone numbers that were associated with the ads, and we
6  also subpoenaed the banks for information as to who held the
7  bank accounts.
8  Q.  So let's just discuss each of those in turn.  As a result
9  of the subpoenas, did you, in fact, receive account holder
10 information for the IP addresses and the bank accounts used to
11 post that ad we just saw?
12 A.  Yes.
13 Q.  And was the IP address or addresses associated with a
14 particular physical location?
15 A.  Yes, it was.
16 Q.  And were you able to identify the individuals associated
17 with those physical locations?
18 A.  Yes.
19 Q.  Who was that?
20 A.  Royce Corley.
21 Q.  Now, you mentioned that you also received subpoena returns
22 for the bank account credit cards, right?
23 A.  Yes.
24 Q.  Did you receive account holder information for that?
25 A.  Yes, I did.

1  Q. And who was the account holder for the credit card that was
2  used to pay for the ad?
3  A. Royce Corley.
4  Q. Now, you said you also -- I think you said you took the
5  associated ads, you looked for phone numbers, is that right?
6  A. Yes.
7  Q. So I think we just saw the ad.  You mean the phone number
8  that was posted on the ad there?
9  A. Yes.
10 Q. What did you do once you identified other phone numbers
11 with the associated ads?
12 A. I took the most commonly used phone numbers and I did
13 Internet searches in order to identify if these specific phone
14 numbers associated with these ads were currently still posting
15 ads for prostitution.
16 Q. And what did you find?
17 A. I did find current ads using those numbers advertising for
18 prostitution.
19 Q. I'd like you to turn to what's in evidence as Government
20 Exhibit 40E.  I believe that's in front of you.  Do you see
21 that, Detective Woods?
22 A. Yes, I do.
23 Q. Can you just describe for us what this document is.
24 A. This is a backpage ad that was printed off the Internet
25 advertising for prostitution.

1  Q.  How did you find this ad?
2  A.  I found it by Googling the phone number on the ad.
3  Q.  So was this one of the phone numbers that you'd identified
4  from the associate ads to the original Elaine Jones ad?
5  A.  Yes, it was.
6  Q.  And if we just look at this ad, do you see it says ebony
7  school girl role play?
8  A.  Yes.
9  Q.  And I'm just going to read it out loud so the jury can --
10 if it's too small:  Small and petite five foot sweetheart with
11 sexy brown skin.  May be small in size but I pack a powerful
12 punch.  Offering Catholic girl fantasy for those that think I'm
13 a bad black girl.  $160 an hour daytime special.  And then it
14 says Janel, and there's a phone number listed.
15          Do you see that?
16 A.  Yes, I do.
17 Q.  Now, after you identified this ad, what steps generally did
18 you take?
19 A.  At that point I put together an undercover operation.
20 Q.  Now, before we turn to that undercover operation
21 specifically, how many undercover separations were you involved
22 in during your six years as vice?
23 A.  Hundreds.
24 Q.  What's the ultimate goal of an undercover operation by the
25 human trafficking team of vice?